**Ralph Ray SOUTHARD, Employee-Respondent,**

v.

**SEARS, ROEBUCK AND COMPANY, Employer-Appellant.**

No. 22168.

Kansas City Court of Appeals.

Missouri.

April 4, 1955.

Lathrop, Righter, Blackwell & Parker, and Winston H. Woodson, Kansas City, for appellant.

Brandom, Frazier & Brandom, and Stanley Baker, Kansas City, for respondent.

RAY WEIGHTMAN, Special Judge.

Since this is a Missouri Workmen's Compensation case, the parties will be referred to as employer and employee. The employer has appealed from a judgment of the Circuit Court of Jackson County, in the amount of $2,000. This action of the court affirmed an award of the Industrial Commission of Missouri, which Commission had affirmed the award of the Referee.

The employer was Sears, Roebuck and Company, and the employee was Ralph Ray Southard. He was employed at the service

station of employer located at the Country Club Plaza in Kansas City, Missouri.

One of the employee's several duties, in this job, was the installation of radios in automobiles.

His claim for compensation is dated January 12, 1951, and bears a stamped notation on the back showing said claim to have been received by the Division of the Workmen's Compensation on January 15, 1951. The employer's answer was executed on January 29, 1951, and bears a stamped notation that it was received by the Division of Workmen's Compensation on January 30, 1951. Depositions were taken, hearings were held, and the testimony revealed the following facts:

The employee went to work for employer in November, 1948, and worked for it until November, 1950, in its service station. He worked on the grease rack, on tires, installed batteries, seat covers and auto radios. In June, 1950, on a Thursday night at about 7:30 on "the 15th approximately, maybe a week early or a week late", he was installing a radio in a Ford convertible. To do this it was necessary and employee did have his head between the dash and the floorboard with his back suspended and his feet straight up in the air. In this position he removed the plastic piece, called the dummy head, which is fastened to the back side of the dashboard. Then "I had the speaker and the head was just placed up there. It wasn't fastened or anything, and I put the speaker in and was trying to get a bolt to fit in the speaker, and as you do that, you have to move one hand, let loose of one part of it, and from the speaker I placed my hand over to the head, reached down to get the bolt and at that time, it dropped a little, and I gave it a quick push to put the speaker and the head back in place, and at that moment of twisting, why, I felt a pain hit me as I pushed down on the back of the seat. It seemed like my hips or what not hit the bottom of the seat, the spring gave." His back was hurting so he got out of the car, rested a little and got a drink of water. Almost immediately he told his foreman his back was hurting a little and he thought he had sprained it. The foreman told him to finish the job because the Ford convertible owner was waiting for it, so he did complete the job. A little while later that night, before 9:30 he again told the foreman, in the dressing room in the presence of three or more other employees, that he had hurt his back. Although the pain was on the increase, he worked the rest of that week and a week or two afterward. During that time he told the department head he had hurt his back and it seemed to be going down into his leg. At his request, he was permitted to do lighter work until the 29th of June, when he went home. Prior to that on the 26th or 27th, at the direction of his department head, he went to the company doctor, who examined him, gave him some pills and told him to sleep on the floor but to go back to work.

On the 29th he went to his own family doctor and was off work for two or three weeks, when the employer company called him to come to its place of business and sent him to a bone specialist, who told him nothing was wrong with him, and that he should go to his family doctor and get a release. He did this and did light duty, at his family doctor's request, for six weeks. He was then put back on routine and heavy duty until November, when he went to the hospital. He was carried from his house to a car and from the car into the emergency room at the hospital. Here he was examined and X-rayed and operated on for the removal of a disc between the 4th and 5th lumbar. This operation was in November, 1950, and he didn't work again until May, 1951. At the time of the trial, he was still suffering from a dull pain in his leg when he would stoop over too much or bend over. In answer to the question, "Are you at this time able to do lifting and running and things like that?", he said he didn't lift very much and didn't run any.

Dr. Harold M. Unger examined Southard on April 3, 1951, and his report was offered as Claimant's Exhibit 3. His examination report ended with the following comment: "This patient apparently had a ruptured disc removed from the interspace between the 4th and 5th lumbar vertebra. He has a

satisfactory result, although there is still evidence of a slight sciatica and limitation of lumbosacral movement. In addition he has sacralization of the 5th lumbar vertebra, being a congenital anomaly. This type of anomaly is usually associated with a narrowed lumbosacral disc. There is still a very feeble tendoachilles response or reflex with some numbness. The question arises whether it may not be necessary to perform a stabilization of the back in the future. Considering all factors in this case and particularly the derangement of the disc, I would estimate the permanent disability due to the injury as 25% of the body as a whole."

For the employer, one Ruckdeschel testified that he was employee Southard's foreman in June, 1950, but that he didn't work the night of Thursday, June 15th or 16th, and his time card showed this to be so. This foreman proved to be a very reluctant witness and only admitted facts upon cross examination and after being confronted with his signed statements. He was not an employee of Sears, Roebuck and Company at the time of the hearing but from all his testimony it can be said that Southard did not report his accident to him and that he only learned of it after the claim was filed. He did say Southard had complained of his back but thought maybe it was lumbago.

Another witness for employer, Carl Etheridge, testified he worked with Southard and was his friend but that he had not known of the injury. He said Southard told him it was rheumatism or lumbago. Franz S. Ingalsbe was the foreman on the job for the week ending June 18, 1950. He said Southard didn't tell him about being hurt on Thursday night, the 16th, and thought he hadn't seen him put in a radio that night. Southard told him his limping around was sciatic rheumatism, according to what his doctor told him. Ingalsbe was not on the job as Southard's foreman on the night of June 8, 1950. Witness Carlton for the employer testified that according to Southard's time card, he, Southard, had worked on Thursday, June 8th, until 9:45, and also on Thursday, June

15th, until 9:34 and that on June 8, Ruckdeschel's time card showed he worked until 9:49 and was Southard's foreman. During this witness's testimony, Southard's lawyer amended his claim to read June 8, 1950, instead of June 16, 1950. Witness Carlton also said Southard never did tell him he injured his back while installing a car radio. Don Fritz, employer's service station manager, testified that he had known Southard since 1948, and that Southard had never told him he injured his back while installing a car radio in June, 1950. He testified and produced records to show no car radios were installed on June 8th or on any Thursday between May 22nd and June 21st. One was installed on June 10th, June 5th, May 27th (four in all, two on one date). Witness didn't know whether Southard installed a car radio on June 10th or not.

The employer's Plaza store superintendent testified that he first learned of Southard's claim when he received notice from the Compensation Board in January, 1951, and that Southard was paid $360 sick leave allowance for eight weeks.

A Miss Schwengel, employer's personnel manager, testified to facts similar to the superintendent's testimony.

Dr. Willoughby, the employer's company doctor in June, 1950, testified that on June 20th, Southard came to his office and he, the doctor, wrote on his card "aching from the right leg, behind knee, and in right hip for the last week, sciatic distribution, phenol chloride and sodium salicylate; bad teeth". He had no record of patient having reported an accident.

Dr. Carl H. Brust testified for the employer that he had, on August 22, 1950, examined Southard on referral by Dr. Myers, Southard's family doctor. Southard did not mention employer nor that he had had an accident on the job at Sears. This witness examined Southard and referred him to a Dr. DeWeese for X-rays of pelvis, hips and lower lumbar. He said ruptured discs didn't occur without "a pretty violent injury".

The depositions of Doctors Jack R. Cooper and G. M. Tice were read in evidence on behalf of employer. Dr. Cooper testified that Southard was admitted to the hospital on November 11, 1950, and that he performed "a partial laminectomy, excision of the herniated disc" and that he was in attendance until Southard was released and that he was assisted in the operation by Dr. William B. Williamson. Dr. Tice testified that three X-rays were taken of Southard under his supervision at the University of Kansas Medical Center and that he didn't "diagnose any disease, he had a congenital lumbar".

Employer's Exhibit A was a report of an examination of Southard by Dr. Harold V. Zuber on March 24, 1951. Without detailing this report, it will suffice to quote his findings as follows: "From the results of this examination, it is the opinon of this examiner that this patient has probably had a herniated low lumbar disc which has been removed. I feel that this patient, at the present time, has some residual affects or symptoms and signs in his lower back."

Employer's Exhibit B is another report of Dr. Zuber of another examination of Southard by him on July 19, 1951, in which he concluded: "From the results of this examination it is the opinion of this examiner that this patient has made definite progress since his last examination. He should wear a lift measuring approximately one-fourth inch in the heel of the left shoe. I do not feel that he has as yet made his maximum degree of recovery."

Dr. Zuber again examined Southard on October 19, 1951, and concluded his report as follows: "From the results of this examination it is the opinion of this examiner that this patient has made definite improvement and I feel that he has probably reached his maximum degree of recovery and that he should be rated. In my opinion he presents a permanent partial disability of the man as a whole approximating 15%."

Appellant employer's first point for reversal is that employee's own testimony on direct examination shows he was not injured by accident arising out of and in the course of his employment. In support of that point, two cases are cited, Keller v. Bechtel etc. Corporation, Mo.App., 174 S.W. 2d 925, and Higbee v. A. P. Green Fire Brick Company, Mo.App., 191 S.W.2d 257. In these cases, compensation was denied because no evidence of accident was found to exist. We think the court properly construed the evidence in those cases, giving the same an interpretation most favorable to the findings and award of the compensation commission, which disallowed the claim. We believe, however, those cases are not controlling under the issues and facts in this case.

■ Appellant employer's second point is that employee's statements on cross examination admitted that nothing unusual occurred except pain. We think employee's testimony hereinbefore quoted sufficiently describes an accident as a result of a "quick push" and "twisting". Nor do we think employee's answers on cross examination are fatal to his cause. He was asked, "Did anything unusual occur or anything different than what had happened before when you were installing other radios?" Answer: "No, nothing only that I got hurt putting in that one". We believe that the triers of the facts were justified in finding that while employee was holding on to the one and a half pound speaker with one hand and at the same time was reaching for the bolt on the floor of the car with his other hand to put the bolt in place, the speaker started to fall out and when he reached over to grab the head to give it a quick push to put the speaker and head back in place and in that moment of twisting he felt a pain hit him. A reading of the case cited by employer in support of its point, Epstein v. Kansas City Public Service Company, Mo.App., 78 S.W. 2d 534, will reveal the difference in the facts and finding between it and the instant case.

Appellant employer's third and last point is that the judgment is not supported by any substantial evidence and is contrary to the evidence and the greater weight of the evidence. Because of this point made by employer and depended upon for reversal, we have detailed the facts.

The triers of the facts had a legal right to believe or disbelieve testimony under their duty to weigh the evidence, State ex rel. Rice v. Public Service Commission, 359 Mo. 109, 220 S.W.2d 61, and although this court is authorized to set aside decisions clearly contrary to the overwhelming weight of the evidence, Thacker v. Massman Construction Company, Mo., 247 S.W. 2d 623, we are of the opinion that the commission's findings in this case are not only supported by competent and substantial evidence, but are reasonably made and are not contrary to the overwhelming weight of the evidence.

The judgment is affirmed.

CAVE, P. J., and DEW, J., concur.